Filed 6/20/14  P. v. Mackabee CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B250143 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. NA089655) |
| v. | |
| MARCEL MAURICE MACKABEE, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Arthur Jean, Jr., Judge.  Affirmed.

H. Russell Halpern for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Victoria B. Wilson and Jessica C. Owen, Deputy Attorneys General, for Plaintiff and Respondent.

_____

# INTRODUCTION

Marcel Maurice Mackabee appeals from a judgment and sentence, following his conviction for murder. He contends his conviction should be reversed, as his trial counsel's representation was ineffective. Finding no reversible error, we affirm.

# PROCEDURAL HISTORY

A jury found appellant guilty of murder (Pen. Code, § 187, subd. (a)).[1] It further found the murder was committed with a firearm (§ 12022, subd. (a)(1)), and during the commission of a robbery (§§ 211, 212.5), within the meaning of section 190.2, subdivision (a)(17).

The court sentenced appellant to life imprisonment without the possibility of parole. Appellant timely filed a notice of appeal.

# FACTUAL BACKGROUND

A. *The Prosecution Case*

    1. *The Victim*

On March 24, 2011, Philip Victor Williamson was found in an alley in the City of Long Beach. His shirt had been clipped off, he was not wearing pants, and he had no identification or keys on his person. He was gasping for breath, and bleeding from his head. After being treated at the scene, he was rushed to the hospital. At the hospital, he was treated for a single gunshot wound to the back of his head and was placed on life support. Shortly thereafter, Williamson died as a result of the gunshot wound.

Lane Walker, a close friend of Williamson's, testified that Williamson trafficked in marijuana. Williamson would acquire marijuana in Northern California, transport it to Southern California, and sell it to cannabis clubs. Walker

---

[1] All further statutory citations are to the Penal Code, unless otherwise stated.

assisted Williamson by transporting the marijuana on multiple occasions. Walker introduced appellant to Williamson, and the three would smoke marijuana together on occasion. A couple of days before Williamson died, he told Walker that he had three duffel bags of marijuana at his house. Having seen the duffel bags in which Williamson transported marijuana, Walker estimated that the bags would have contained 12 to 18 pounds of marijuana. After Williamson's death, Walker was interviewed by the police. She provided the police with the phone numbers of appellant and his wife. Appellant's was a number ending in 4649.

Arturo Zamora helped Williamson sell marijuana in Southern California. A few days before Williamson's death, Williamson asked Zamora to help him sell 10 or 11 pounds of high quality marijuana. Around that same time period, Zamora saw Williamson with a large amount of cash in his bedroom. Based upon Zamora's experience working at a bank, he estimated Williamson had between $150,000 and $375,000 in cash.

### 2. *The Police Investigation*

Long Beach Police Detective Donald Goodman was assigned to investigate the murder. His investigation led him to believe Williamson's body had been dumped in the alley, as (1) no one living nearby had heard gunshots, (2) there was no blood trail in the alley, and (3) Williamson had no pants or identification on his person. After ascertaining Williamson's identity, Detective Goodman looked up his address in a database and went to his apartment in Beverly Hills. The apartment was locked, and there were no signs of forced entry. Inside, Detective Goodman found items indicative of drug trafficking, including a scale, a box of sandwich bags, a "pay owe" ledger, nine cell phones, small amounts of marijuana in different containers, and seven large duffel bags, which were empty but smelled

3

strongly of marijuana. He did not find large quantities of marijuana, and found only about $144 in cash.

Detective Goodman also found a 7-Eleven receipt inside Williamson's home, with a time-stamp of 12:27 p.m., March 24, 2011 (the day of Williamson's murder). The items listed on the receipt were found in the home. The police went to the 7-Eleven to obtain video surveillance. Detective Goodman reviewed the video. He saw a man who looked like appellant purchase the items at the 7-Eleven and leave in a dark sports utility vehicle (SUV). The video was played for the jury.

Detective Goodman obtained Williamson's cell phone records. The last call was to a phone number ending in 4649 listed on a piece of paper found in Williamson's home. Next to the phone number was the name "Marcel." Detective Goodman obtained a search warrant, and learned the number was registered to a "John Lamack." The detective could not find an exact match in police databases for a person with that name and birthday. Because Williamson was from the Chico area of Northern California, the detective called Chico Police Department for assistance. He was told that a search on the number had a negative result. However, the call led to information that allowed Detective Goodman to find appellant's full name, Marcel Mackabee. He learned that appellant was also from Chico, and that appellant's wife, Rosemary Sayegh, had an SUV -- a black Toyota 4Runner -- registered under her name.

The police obtained authorization to wiretap appellant's home and cell phones, the cell phone of his wife and the phone of his cousin, Charles Mackabee.[2]

_____

[2] Some of the phone calls were the subject of an Evidence Code section 402 hearing, during which the prosecutor discussed the participants in and the contents of each call. Defense counsel argued the calls were irrelevant and admission of the calls would prejudice appellant due to his use of coarse language. The court ruled that the calls were admissible.

4

To stimulate conversation, the police passed out fliers around Chico; the fliers contained information about the crime and the murder victim. The police also released video footage to the media of appellant at the 7-Eleven; a media release explained the police were looking for the person depicted in the video, as well as the 4Runner he was seen entering outside the 7-Eleven.

Detective Goodman testified that he participated in the process of obtaining the wiretap authorization, and that he listened to every intercepted phone call. He further testified that he was familiar with appellant's voice. Several recordings of calls were played for the jury to show that appellant was aware of and interested in the police investigation of Williamson's murder. During one of the calls, appellant was advised to "stay off the phezzy." Detective Goodman stated that it meant to stay off the phone.

On the morning of July 12, 2011, a police surveillance team observed appellant's wife, Sayegh, leave the 4Runner on a residential street and walk away from it. Soon thereafter, a black Mitsubishi pulled up next to the 4Runner. A thin Black man got out and jumped into the 4Runner. Both cars then sped away in the same direction. Another police surveillance team followed the cars onto the Interstate 5 freeway.

At Detective Goodman's instruction, the California Highway Patrol (CHP) performed a traffic stop of the 4Runner. Appellant's cousin, Chevez Turner, and appellant's half-brother, Jacquez Newman, were inside. A CHP officer told the two men that they were being detained based on the tint of the SUV's windows and on suspicion of drug trafficking. The police impounded the 4Runner while the men took a bus home. The police documented the condition of the vehicle and installed a hidden Global Positioning System (GPS) transmitter to track the

5

vehicle. The police then released the vehicle back to CHP custody, where it was retrieved by appellant.

The police froze Sayegh's bank accounts, believing the accounts might hold the money missing from Williamson's home. On July 29, the police observed Sayegh take a "bank bag" from her workplace to a mall parking lot. There, she met another woman and gave her the bag. The police made contact with the other woman, and found $38,700 in cash inside the bag.

That same day, the police used the GPS transmitter to track the 4Runner to a residential street within a few miles of Chevez Turner's home. After impounding the 4Runner, Detective Goodman noticed that its entire interior had been changed.

Joseph Trawicki, the custodian of records for Sprint (appellant's and the victim's cellular service provider), testified that the location where a cell phone was used can be discerned from cell phone records, as using the cell phone requires communication with the nearest cell phone tower. The cell phone records for phone numbers ending in 7652 and 4649 and a notebook showing cell phone tower locations were submitted into evidence. The phone records indicated that the subscriber for the first number was Philip Williamson, and for the second number was "John Lamack." The second number was the same number written next to the name "Marcel" on the slip of paper found in Williamson's apartment. It also was the number Walker had identified as appellant's. The cell phone records indicated that on the day of the murder, the phones were used in Beverly Hills around noon, and in Long Beach that evening.

Finally, 12 minutes before the police were dispatched to the alley where Williamson was found, the 4Runner was recorded a half mile away by an automated license plate reader camera.

6

### 3. *Ronnie Turner's Testimony*

Ronnie Turner, appellant's uncle and the father of Chevez Turner, testified at the preliminary hearing but died before trial.[3] Over a hearsay objection by trial counsel, Ronnie's prior testimony was read to the jury. According to Ronnie, when he saw the 7-Eleven surveillance video broadcast, he recognized appellant and screamed. The scream woke appellant, who was staying at his uncle's home. The two men then replayed the footage. Appellant left that night.

Appellant already had told Ronnie what had happened. Appellant said he had stolen a large quantity of marijuana from "a white boy" from Chico. Appellant had arranged a deal with the victim to purchase a large amount of marijuana. To gain the victim's confidence, appellant had shown him a photo of cash he purportedly would use to purchase the marijuana. They had become friendly, and the victim had shown appellant a large amount of money at his home. Appellant said it was "more money than he [had] ever seen in his life." After seeing the money, appellant made a plan to rob the victim of his marijuana and money. The plan involved three people. During the robbery, one of appellant's companions shot the victim while they were in the 4Runner. The victim's body was dumped in the alley in Long Beach. Appellant then returned to the victim's house and took money, marijuana, and a safe.

The cross-examination of Ronnie at the preliminary hearing also was read to the jury.[4] He admitted telling the police that he would do anything for his son, Chevez. He also admitted contacting the police after learning that his son had been

---

[3]     As Ronnie and Chevez share the same last name, we refer to them by their first names for clarity.

[4]     Appellate counsel represented appellant during the preliminary hearing. Counsel later withdrew, and new counsel represented appellant at trial.

detained for failing to speak with the police about Williamson's murder. Ronnie wanted his son released if he spoke with Detective Goodman about what appellant had told him. Ronnie also admitted having suffered a felony conviction and having served two prison terms. Defense counsel asked numerous and specific questions challenging the closeness of Ronnie's relationship with appellant and the likelihood that appellant would confide to Ronnie about a murder. In response to counsel's questioning, Ronnie acknowledged providing some inconsistent answers to Detective Goodman. For example, he initially told Detective Goodman the victim was robbed at the victim's house; later, he told the detective the victim was robbed in the truck.

### 4. *Chevez Turner's Testimony*

At trial, Chevez stated he did not want to testify against appellant. He admitted that at one time, appellant's wife's 4Runner was parked in his garage. Although Chevez admitted to having been interviewed by the police on two separate occasions, he then sought to assert a right against self-incrimination, declined to answer some questions, and denied having told the officers details relating to Williamson's murder, including his conversations with appellant.

Detective Goodman testified he interviewed Chevez on two occasions. Recordings of both interviews were played for the jury. In the first interview, Chevez stated that after the 7-Eleven footage was broadcast, he was contacted by appellant's half-brother, Newman. Newman wanted Chevez to accompany him and appellant to Los Angeles to get the 4Runner. In Los Angeles, the three men met appellant's wife, Sayegh, who was driving the 4Runner. Chevez and Newman then got into the 4Runner and drove away; appellant drove away in the car the three men had driven, and Sayegh walked home. Chevez and Newman were driving the 4Runner to Chico when they were pulled over by the CHP. The CHP

8

impounded the car, a tow driver gave the men a ride to a nearby bus stop, and Chevez took a Greyhound bus to Sacramento.

About a week later, appellant and Sayegh came to Chevez's house. Appellant asked if he could park the 4Runner in Chevez's garage for a couple of days. Chevez gave him permission. Appellant told Chevez that a body had been in the 4Runner, and that there might be blood left in the vehicle. Two or three days later, appellant returned for the 4Runner. At that time, appellant removed the entire interior of the vehicle and replaced it with new parts.

In the second interview, Chevez told the police about another conversation he had with appellant. Appellant told him that he, another cousin, Charles Mackabee, and a third man met the victim to buy about 10 pounds of marijuana. However, the third man "'wowed' out" and shot the victim. Charles and the shooter then placed the victim's body into appellant's vehicle, and appellant drove to an alley in Long Beach where they dumped the body.

### 5. *Michelle Morris's Testimony*

Michelle Morris, Chevez's wife, testified she saw the photograph of the man shown in the 7-Eleven surveillance in the newspaper and thought the man resembled appellant. The day after the footage of the 7-Eleven was broadcast, she picked up her husband at the Sacramento Greyhound station. He told her that he had been pulled over for the tint on his windows and "supposedly some dogs were barking like they had smel[led] some drugs." A few days later, she came home from work to find a black truck parked in their garage. Morris "noticed some cleaning smells" in the garage and saw one of the seats of the truck on the floor. Morris told Chevez she wanted the truck out of their garage because she "had put two and two together" and realized it "might have been the same truck they were looking for on the news."

9

Morris was later interviewed by the police. She told them she had overheard appellant tell Chevez that the incident started in the house of the guy who got shot. Appellant stated that he and his two cousins planned to buy some "trees" -- marijuana -- but the deal went bad and the victim ended up getting shot by one of the cousins. According to appellant, the men then put the victim's body into appellant's truck and drove it somewhere else.

### 6. *Jerome Webster's Testimony*

Jerome Webster, a friend and co-worker of Chevez's, contacted the police about the 4Runner. Webster informed them of what Chevez had said appellant had told him about the murder. Chevez stated appellant had told him that the victim was showing off money -- $300,000 in cash -- and that appellant came back with two other people to rob the victim. Appellant further stated the victim was killed in Long Beach and dumped in an alley. After this conversation, Webster looked up the news story about the murder on the computer. He saw the 7-Eleven footage, and recognized the person in the video as appellant. When Webster contacted the police, he also asked about a reward, but, at the time of trial, he had received no reward money.

### B. *The Defense Case*

Appellant testified in his defense. Appellant and his wife owned two vehicles, a Chevy Geo and the 4Runner. Appellant admitted changing out the interior of the 4Runner. He did so because when the police first impounded the car, they had ripped the front seat, pulled off some buttons inside the dash, and left behind a residue of chemicals used to detect blood and gunpowder. Appellant claimed the police did not clean up the car to the satisfaction of his wife, forcing him to "switch out everything" on his own. He did not file a claim with the police

10

for the damage to the 4Runner because he planned to file a lawsuit for damages to the vehicle

Appellant admitted trafficking in marijuana. He would grow marijuana in Northern California, transport it to Southern California, and sell it in Southern California and out of state. Appellant was introduced to Williamson by Walker. He sold Williamson marijuana a couple of times, and they became friends. The day of the murder, appellant and Williamson went to a 7-Eleven and got materials to smoke "blunts" -- marijuana cigarettes -- together. They then played video games at Williamson's home for a couple of hours before appellant left, by himself, for his aunt's house in Long Beach. Appellant then left his aunt's house and drove to Los Angeles. He identified the number of the cell phone he was using at that time as a number ending in 4649.

Appellant was the only person driving the 4Runner on March 24. Appellant rarely drove the 4Runner; he usually drove rental cars. Appellant preferred driving rental cars because he "like[d] to stay underneath the radar, so [he] switch[ed] cars all of the time." At one point, he left the 4Runner with Chevez, because he had to go to court in Chico and a rental car was more fuel efficient

## DISCUSSION

Appellant contends his trial counsel rendered ineffective assistance, because (1) counsel failed to interject objections to certain evidence elicited by the prosecution, (2) counsel failed to file a motion pursuant to section 1538.5 to exclude the testimony of four prosecution witnesses, and (3) counsel failed to call Detective Goodman to impeach Ronnie's testimony.

In order to prevail on a claim of ineffective assistance of counsel, appellant must show (1) that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and (2) that there is a

11

reasonable probability that but for counsel's unprofessional errors, the result would have been more favorable to the defendant. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688; *People v. Gray* (2005) 37 Cal.4th 168, 206-207; *People v. Kelly* (1992) 1 Cal.4th 495, 519-520.) When "defense counsel's reasons for conducting the defense case in a particular way are not readily apparent from the record, we will not assume inadequacy of representation unless there could have been '"no conceivable tactical purpose"' for counsel's actions." (*People v. Earp* (1999) 20 Cal.4th 826, 896.)

### A. *Failure to Interject Evidentiary Objections*

Appellant contends that defense counsel's failure to raise certain evidentiary objections constituted ineffective assistance. We disagree. Whether to object to evidence is quintessentially a tactical decision entrusted to counsel. (*People v. Neely* (1999) 70 Cal.App.4th 767, 783 ["Whether to object to testimony and on what grounds are generally tactical matters"]; *People v. Perry* (1969) 271 Cal.App.2d 84, 114-115 ["'The choice of when to object and when to allow the evidence to come in as offered is inherently a matter of trial tactics.'"].) Absent a showing that there could be no tactical reason for counsel's decision, appellant cannot demonstrate ineffective assistance. (See *People v. Lucas* (1995) 12 Cal.4th 415, 444 ["The decision whether to object to evidence at trial is a matter of tactics and, because of the deference accorded such decisions on appeal, will seldom establish that counsel was incompetent"]; *People v. Freeman* (1994) 8 Cal.4th 450, 490-491 ["[T]he decision whether to object is inherently tactical, the failure to object to evidence will seldom establish incompetence."].) Moreover, even where no tactical reason could explain the failure to object, ineffective assistance is not shown absent prejudice. (See *People v. Lucas*, *supra*, at p. 445 ["a conviction will not be reversed unless the record on appeal demonstrates

counsel had no rational purpose for the failure to object, and the failure was prejudicial"].) As discussed below, appellant has failed to show either that counsel lacked a tactical reason to refrain from objecting to certain evidence, or that his failure to do so was prejudicial.

First, appellant has not shown that most of his proposed evidentiary objections would have been sustained. Defense counsel cannot be considered ineffective for failing to make groundless objections. (*People v. Boyette* (2002) 29 Cal.4th 381, 437.) For example, appellant's suggestion that his trial counsel should have objected to certain evidence under the best evidence rule is without merit, as the Legislature has repealed that rule. (*People v. Skiles* (2011) 51 Cal.4th 1178, 1187.) Similarly, trial counsel could have raised no valid objection to Walker's testimony that Williamson trafficked in marijuana, as it was based on her assistance in transporting marijuana for him. Nor could counsel have legitimately objected to Zamora's estimate of the amount of money at Williamson's, as it was based on Zamora's personal experience working at a bank.

Much of Detective Goodman's testimony that appellant now contends should have been objected to was admissible to explain the detective's investigation of the murder. (*People v. Zavala* (2013) 216 Cal.App.4th 242, 249-250 (*Zavala*) [trial court well within its discretion to allow detective's testimony concerning phone call records for limited purpose of explaining the detective's steps in his investigation].) Likewise, the testimony of Sprint records custodian Trawicki was based upon the cell phone records, which were properly admitted into evidence as business records. (*Id*. at p. 249.) Moreover, appellant admitted using the phone number registered to "John Lamack."

Second, even were some of appellant's proposed evidentiary objections colorable, appellant has not shown his trial counsel lacked any tactical basis for

13

failing to raise them. Competent counsel may forgo even a valid objection for tactical reasons. (*People v. Slaughter* (2002) 27 Cal.4th 1187, 1210.) For example, defense counsel may forgo an objection to avoid highlighting testimony to the jury (*People v. Wharton* (1991) 53 Cal.3d 522, 567), or to avoid causing a prosecutor to establish a more compelling foundation for the admission of the contested testimony (*People v. Dennis* (1998) 17 Cal.4th 468, 532). Appellant suggests that testimony about the ownership of the 4Runner was inadmissible hearsay, but there were ample reasons for counsel to forego making an objection. Appellant admitted that his wife owned a 4Runner and that he was driving it on the day of the murder. Chevez testified he picked up the 4Runner from appellant's wife and was driving it when stopped by CHP. He further testified that it was the same 4Runner he allowed appellant to park in his garage, the same 4Runner appellant told him had had a body in it, and the same 4Runner whose interior appellant replaced. Finally, it was indisputably the same 4Runner whose license plate was recorded by the automated license plate reader as being a half-mile from the alley where Williamson was found minutes before police were dispatched to attend to him.

Moreover, appellant has not shown that he suffered prejudice as a result of his counsel's failure to interpose objections. Admission of hearsay evidence is not prejudicial where there is independent and uncontradicted evidence to the same effect. (*People v. Welch* (1999) 20 Cal.4th 701, 749.) Thus, Detective Goodman's testimony that Williamson's body was dumped in the alley was cumulative of testimony by Ronnie and Chevez that appellant told them the body was dumped in the alley. Similarly, Detective Goodman's testimony about the CHP stop was corroborated by Chevez's testimony as a percipient witness to the stop.

14

There was overwhelming evidence of appellant's guilt. Appellant admitted being with the victim the day of the murder; the 4Runner he was driving was in the immediate vicinity of the alley minutes before the victim's body was found; and appellant admitted his involvement in the murder to Ronnie and Chevez Turner. Despite appellant's cataloguing of numerous objections trial counsel could have made, he fails even to attempt to show prejudice, and we find none.[5] Thus, appellant has not shown that his trial counsel's failure to interpose evidentiary objections constituted ineffective assistance.

B.     *Failure to File a Section 1538.5 Motion*

Appellant contends trial counsel erred in failing to file a motion to exclude the testimony of Chevez, Ronnie, Morris, and Webster, as the police discovered these witnesses only after illegally installing the GPS transmitter in the 4Runner. We disagree.

First, even assuming that the installation of the GPS transmitter in the 4Runner while in lawful custody was a "search" for purposes of the Fourth Amendment (see *United States v. Jones* (2012) __ U.S. __ [132 S.Ct. 945] (*Jones*)), searches conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule. (*People v. Davis* (2011) __ U.S. __ [131 S.Ct. 2419, 2423-2424] [applying good-faith exception enunciated in *United States v. Leon* (1984) 468 U.S. 897 to new Fourth Amendment precedent].) Here, the police installed the GPS transmitter in 2011,

---

[5]     For example, Detective Goodman's testimony that "John Lamack" was a fictitious name is irrelevant, as appellant admitted using the phone number registered to that name. Likewise, testimony about (1) the date of appellant's marriage to Sayegh, (2) the home address of appellant's cousin Charles, (3) the fact that a car seen near the victim's residence was owned by the victim, and (4) the fact that appellant's grandmother owned a house in Chico has no bearing on appellant's guilt or innocence.

before *Jones* was decided. At the time, *People v. Zichwic* (2001) 94 Cal.App.4th 944, 953 -- holding the installation of a tracking device is not a "search" for purposes of the Fourth Amendment -- was still good law. Thus, the testimony of the four witnesses cannot be excluded as "'fruit[s] of the poisonous tree.'" (*Wong Sun v. United States* (1963) 371 U.S. 471, 488 [evidence is "'fruit of the poisonous tree'" where it is discovered by exploitation of illegality].)

More important, the police would have discovered these witnesses even without installing the GPS transmitter. Chevez was in the 4Runner when the CHP stopped the vehicle. Thus, the police were aware of Chevez before the GPS transmitter was installed. A simple investigation would have led to Chevez's father, Ronnie, and his wife, Morris. As to Webster, aside from being Chevez's co-worker and friend, he contacted the police on his own. Thus, appellant cannot show that the police would not have discovered these witnesses but for the purported illegal action of installing the GPS transmitter. (See also *People v. Thierry* (1998) 64 Cal.App.4th 176, 180 [even where evidence is the "'fruit of a poisonous tree,'" it may be admitted if (1) the same evidence was discovered through an independent, untainted source, (2) the evidence inevitably would have been discovered, or (3) the connection between illegality and evidence is too attenuated].) Accordingly, trial counsel was not ineffective for failing to file a section 1538.5 motion to exclude the witnesses' testimony.

C. *Failure to Impeach Ronnie Turner's Testimony*

Finally, appellant contends trial counsel was ineffective for failing to call Detective Goodman to impeach Ronnie's preliminary hearing testimony read into evidence at trial. We disagree.

Trial counsel's failure to call Detective Goodman did not constitute ineffective assistance. Ronnie's entire preliminary hearing testimony was

16

admitted, including his cross-examination by defense counsel. Counsel challenged Ronnie's credibility repeatedly, eliciting that he was a convicted felon, and that his primary motivation in speaking with the police was to secure his son's release. After claiming to be close to appellant, Ronnie acknowledged on cross-examination that he had been to appellant's house only once. He also acknowledged providing inconsistent accounts to Detective Goodman about what appellant had told him. We discern no ineffective assistance in trial counsel's decision not to call Detective Goodman to elaborate on those inconsistencies.

In sum, appellant has not shown that trial counsel's representation was inadequate, or that trial counsel's purported errors were prejudicial.

**DISPOSITION**

The judgment is affirmed.


**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.**



MANELLA, J.


We concur:



EPSTEIN, P. J.                                                    EDMON, J.*

_____
* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.